UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BEAU BURCH-LUCICH,<br><br>                Plaintiff,<br>v.<br><br>GARY L. LUCICH; MARCAE LUCICH; MICHELLE LUCICH NIECE; LUCICH FAMILY LIMITED PARTNERSHIP, an Idaho limited partnership; and NORTHWEST FUNDING, LLC, formerly known as LUCICH LLC, an Idaho limited liability company,<br><br>                Defendants. | Case No. 1:13-cv-00218-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

### INTRODUCTION

Before the Court is defendants' Motion to Dismiss for Lack of Jurisdiction and/or to Compel Arbitration (Dkt. 6). The motion is fully briefed and the Court has determined oral argument would not significantly assist the decisional process. The Court will therefore resolve the motion without a hearing. As explained below, the Court will deny the motion.

# BACKGROUND

Plaintiff Beau Burch-Lucich is Troy Lucich's only child. Troy died in 1998 when Beau was eight years old. Beau did not know it at the time though, because his mother was raising him in Texas and Troy was not involved.

Beau alleges that his grandparents, defendants Gary and Marcae Lucich, knew he existed but probated Troy's estate as though Troy had no children. As a result, Troy's assets were allegedly distributed to (1) Gary and Marcae; (2) Troy's sister, Michelle; (3) Michelle's children; and "perhaps" (4) the Lucich Family Limited Partnership. *Compl.* ¶ 18. Beau alleges that all of Troy's assets should have gone to him because, at the time of his death, Troy had no will, no spouse, and no other children.

During the summer of 2004, when Beau was fourteen years old, he wanted to meet his father. He learned Troy had died six years earlier, but he went to visit his grandparents (Troy's parents) in Idaho. Part of that visit included a paternity test, which conclusively established that Troy was Beau's father. During the visit, Beau's grandparents told him he was entitled to one-third of Troy's one-third interest, or eleven percent, in the Lucich Family Limited Partnership, which was created in 1999, after Troy's death. That eleven percent interest was allegedly conveyed to Beau during a family meeting. *See Compl.* ¶ 3.

Beau alleges he did not learn about the probate of his father's estate until March 2013. He sued in May 2013, alleging seven claims: (1) probate fraud under Idaho Code § 15-1-106; (2) conspiracy to commit probate fraud; (3) breach of fiduciary duty; (4)

conspiracy to breach "partnership fiduciary duties"; (5) constructive trust; (6) declaratory judgment; and (7) a "partner's direct action" under Idaho Code 53-2-1001.

## MOTION TO DISMISS
## FOR LACK OF SUBJECT-MATTER JURISDICTION

Defendants first contend that this Court lacks subject-matter jurisdiction. Beau alleges jurisdiction under 28 U.S.C. § 1332, based on diversity of citizenship. According to the complaint, Beau is a citizen of Texas, the defendants are citizens of Idaho, and the amount in controversy exceeds $75,000. Defendants do not dispute any of this, but say that even if the requirements for diversity jurisdiction are met, the probate exception strips the Court of jurisdiction.

**1.    The Probate Exception to Diversity Jurisdiction**

The probate exception is "distinctly limited in scope," as the Supreme Court clarified in *Marshall v. Marshall*, 547 U.S. 293, 299 (2006). *Marshall* described the basic contours of the exception as follows:

> [T]he probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.

*Id*. at 311-12. So under *Marshall*, this Court must answer three questions: (1) Does the action require the Court to probate or annul a will? (2) Does it require the Court to administer Troy's estate? and (3) Does it require the Court to dispose of property in the custody of a state probate court?

MEMORANDUM DECISION AND ORDER - 3

The answer to all three questions is no. Beau is claiming his grandparents and other relatives committed various torts, including fraud and breach of fiduciary duty, when they purposely left him out of Troy's probate proceedings. He also claims that he is entitled to a larger share of the Lucich family partnership. These issues can be resolved without probating Troy's will (if one existed) or administering Troy's estate. Also, Beau is not seeking to "reach a *res* in the custody of a state court." *Id.* at 312. He is seeking a personal judgment against the defendants themselves, who allegedly already received estate assets. *See Compl.* ¶ 18. Pursuing these claims in federal court will not interfere with Troy's probate proceedings within the meaning of the probate exception. *See, e.g., Jones v. Brennan*, 465 F.3d 304, 307-08 (7th Cir. 2006) (Posner, J.) (a breach of fiduciary duty claim accusing the guardians of mismanaging an estate "does not ask the court . . . to administer the estate"); *Breaux v. Dilsaver,* 254 F.3d 533, 536-37 (5th Cir. 2001) (probate exception did not apply when heirs sought damages against estate administrator personally for his alleged fraud and breach of fiduciary duty, where any judgment would be satisfied from administrator's own property and not from estate property).

Despite *Marshall,* defendants insist this Court lacks jurisdiction because Beau is alleging fraud under Idaho Probate Code § 15-1-106. This section, however, just says that if someone has perpetrated a fraud in connection with probate proceedings, then "any person injured thereby" may obtain (a) "appropriate relief against the perpetrator" or (b)

"restitution" from persons who benefitted from the fraud. Idaho Code § 15-1-106.[1]  So when a court entertains an action under § 15-1-106 it is not interfering with the probate proceedings.  That is, the court would not be probating or annulling will, administering an estate, or disposing of property in the state court's custody.

This point is underscored by the Uniform Law Comments to this section, which clarify that "[t]he remedy of a party wronged by fraud is intended to be supplementary to other protections provided in the Code and [an action under this section] can be maintained outside the process of settlement of the estate." *See* Idaho Code § 15-1-106, Uniform Law Cmts.[2]  This Court, therefore, may properly hear a fraud action under Idaho Code § 15-1-106.

Finally, the Court is not persuaded that it could decline jurisdiction as a discretionary matter simply because this case has, as defendants put it, "probate overtones." *Mot. Mem.*, Dkt. 6-1, at 6.  Under *Marshall,* jurisdiction plainly exists, notwithstanding the probate overtones.  And, as "Chief Justice Marshall famously cautioned: 'It is most true that this Court will not take jurisdiction if it should not: but it is

---

[1] In full, Section 15-1-106 provides:

> Whenever fraud has been perpetrated in connection with any proceeding or in any statement filed under this code or if fraud is used to avoid or circumvent the provisions or purposes of this code, any person injured thereby may obtain appropriate relief against the perpetrator of the fraud or restitution from any person (other than a bona fide purchaser) benefitting from the fraud, whether innocent or not.

[2] The full sentence from which this quote is taken reads as follows:  "The remedy of a party wronged by fraud is intended to be supplementary to other protections provided in the Code and can be maintained outside the process of settlement of the estate."  Idaho Code § 15-1-106, Uniform Law Cmt.

**MEMORANDUM DECISION AND ORDER - 5**

equally true, that it must take jurisdiction if it should . . . . We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Marshall*, 547 U.S. at 298-99 (quoting *Cohens v. Virginia*, 6 Wheat. 265 (1821)).

For all these reasons, the Court will deny defendants' motion to dismiss this case based on the probate exception.

**2.     The Declaratory Judgment Claim**

Defendants also urge the Court to decline jurisdiction as a discretionary matter because Beau has alleged a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201. His sixth claim asks the Court to declare that Beau "owns and/or is entitled to more of the Limited Partnership than 11%." *Compl.* ¶ 60.

Where diversity jurisdiction exists, the district court has discretion to hear a declaratory judgment action. *Avemco Ins. Co. v. Davenport*, 140 F3d 839, 842, n.1 (9th Cir. 1998). In exercising its discretion, a district court considers the non-exclusive factors laid out in *Brillhart v. Excess Insurance Company of America*, 316 U.S. 491 (1942), which include: (1) avoiding needless determination of state law issues; (2) discouraging litigants from filing declaratory actions as a means of forum shopping; and (3) avoiding duplicative litigation. Nevertheless, "when other claims are joined with an action for declaratory relief (*e.g.,* bad faith, breach of contract, breach of fiduciary duty, rescission, or claims for other monetary relief), the district court should not, as a general rule, remand or decline to entertain the claim for declaratory relief." *Gov't Employees Ins. Co. v. Dizol,* 133 F.3d 1220, 1225 (9th Cir. 1998). In that case, "the appropriate inquiry for a

district court in a Declaratory Judgment Act case is to determine whether there are claims in the case that exist independent of any request for purely declaratory relief, that is, claims that would continue to exist if the request for a declaration simply dropped from the case." *Snodgrass v. Provident Life & Accident Ins. Co.*, 147 F.3d 1163, 1167-68 (9th Cir.1998) (per curiam).

Here, Beau alleges claims for monetary relief that exist independently of his declaratory relief claim.  In his fraud claims, for example, Beau alleges that the defendants caused his father's assets to be wrongly distributed to others.  *See Compl.* ¶¶ 35-43.  Those claims could easily be adjudicated if the declaratory relief claim dropped out of the lawsuit.  As a result, this Court cannot decline jurisdiction merely because Beau has also alleged a declaratory relief.  As the Ninth Circuit has explained, district courts have a "'virtually unflagging'" obligation to exercise jurisdiction over monetary claims.  *Dizol*, 133 F.3d at 1225 n.6 (citation omitted); *see also United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1113 (9th Cir. 2001).  Defendants' motion to dismiss the complaint based Beau's inclusion of a declaratory relief claim will therefore be denied.

**The Motion to Compel Arbitration**

The Court will also deny defendants' motion to compel arbitration at this time because there are factual disputes as to whether the parties agreed to arbitrate.

1.  **Governing Law**

As a threshold matter, the parties dispute whether federal or state law governs. Defendants relied on the Federal Arbitration Act, 9 U.S.C. §§ 1 to 16, in moving to compel, but Beau contends that Idaho's Uniform Arbitration Act governs. *See* Idaho Code §§ 7-901 to 902. The Court will resolve this dispute for the sake of clarity, but it is largely an academic one because the federal and state acts are "virtually identical." *Mason v. State Farm Mut. Auto Ins. Co.,* 177 P.3d 944, 947 n.1 (Idaho 2007).

The Federal Arbitration Act applies to contracts involving interstate commerce. *See* 9 U.S.C. § 2. The putative contract at issue here involves a Texas resident obtaining an interest in an Idaho limited partnership. This would plainly seem to involve interstate commerce, and neither side makes a contrary argument. The Court therefore concludes that the Federal Arbitration Act governs. *See generally Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 274-75 (1995) (the interstate-commerce requirement should be construed broadly to include all activities that merely affect interstate commerce).

That said, the Federal Arbitration Act allows parties to agree to arbitrate disputes according to a particular states' rules or procedures, so long as those rules and procedures do not conflict with or undermine the policies of the federal act. *See Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). As the Supreme Court has explained, "Arbitration under the [Federal Arbitration] Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will

arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted." *Id.*

The arbitration clause in the partnership agreement says controversies will be arbitrated according to the rules and practices of the American Arbitration Association (AAA), unless those rules and practices conflict with the Idaho rules of civil procedure or other provisions of Idaho law. In that case, Idaho law governs. *Partnership Agmt.*, Dkt. 6-2, § 15.1  So assuming Beau became bound by this arbitration clause, the AAA rules (or Idaho law if necessary) would apply. The Court will therefore look to these rules in resolving this motion.

Turning to the more specific legal standard governing this motion, the Court concurs with plaintiff that a summary-judgment standard applies, as there are factual issues regarding whether the parties agreed to arbitrate. Defendants object to this, but both Idaho and federal courts have applied a summary-judgment standard to motions to compel arbitration.[3]  *See, e.g., Wattenbarger v. A.G. Edwards & Sons, Inc.*, 246 P.3d 961, 970 (Idaho 2010); *Hutchins v. DirecTV Customer Serv., Inc.*, Case No. 1:11-cv-422-REB, 2012 WL 1161424, at *2 (D. Idaho Apr. 6, 2012).  Under this standard, the Court will treat "the facts as [it] would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most

---

[3] Numerous federal courts have applied a summary-judgment standard to motions to compel. *See, e.g., Bensadoun v. Jobe-Riat,* 316 F.3d 171, 175 (2d Cir. 2003); *Brown v. Dorsey & Whitney, LLP,* 267 F.Supp.2d 61, 67 (D.D.C. 2003).  The Ninth Circuit, for its part, has recognized that "denial of a motion to compel arbitration has the same effect as a grant of partial summary judgment denying arbitration." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008).

favorable to the non-moving party." *Hutchins,* 2012 WL at *2 (internal quotation marks and citation omitted).

**2.      The Existence of an Arbitration Agreement**

The Court's first task in deciding whether to compel arbitration is to determine whether an arbitration agreement exists. *See Loomis, Inc. v. Cudahy,* 656 P.2d 1359, 1362 (Idaho 1982); *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). After all, the "first principle" of arbitration is that "a party cannot be required to submit [to arbitration] any dispute which he has not agreed to so submit." *AT&T Techs, Inc. v. Commc'ns Workers*, 475 U.S. 643, 648 (1986).

On the existing factual record, the Court cannot find, as a matter of law, that the parties agreed to arbitrate. Defendants rely on the limited partnership agreement to prove that an arbitration agreement exists. Nobody disputes the existence of that agreement or that it contains an arbitration clause. But Beau did not sign that agreement; it was apparently signed around 1999 – well before Beau had met the Lucich family. And the parties dispute whether Beau became bound by the terms of that agreement at some later point. The partnership and the remaining partners say Beau never became a limited partner because he did not satisfy certain conditions precedent. Specifically, they say Beau was supposed to complete education or military service requirements before obtaining an "enforceable" interest in the partnership, which he never did. Additionally, regardless of whether Beau satisfied this condition, the partnership has taken the position that some of the limited partners may not have consented to Beau's involvement as a

limited partner in the first place. *See July 30, 2013 email from Ken Kreis to Monte Stewart et al, Ex. 3 to Stewart Aff.*, Dkt. 9-1.

On this record, the Court cannot tell if the parties ever concluded any agreement at all, much less an agreement that includes an arbitration clause. It may well be that the conditions defendants mention (relating to education or military service) were merely conditions to performance – not conditions precedent to the formation of a contract. *See generally* 13 *Williston on Contracts* § 38:4 (4th ed.) (discussing both types of conditions). But it is impossible tell on this record. Further, the dispute about the conditions is not the only one; as noted, the partnership is suggesting there was no contract with Beau regardless.

On this conflicted factual record, the Court cannot order arbitration. Instead, it must "proceed summarily" to determine whether an arbitration agreement exists and, if so, the scope of that agreement. *See* Idaho Code § 7-902. Under Idaho's Uniform Arbitration Act, there is no explicit right to have a jury decide whether an arbitration agreement exists.[4] *See id.* Rather, the applicable section says only that "if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised . . . ." *Id.* Beau has conceded that the arbitration provision in the partnership agreement – which he allegedly became party to –

---

[4] Earlier, the Court held that the Federal Arbitration Act governs the putative contract, and the Federal Arbitration Act expressly provides for a jury trial on this issue, if demanded. *See* 9 U.S.C. § 4. But recall that the Federal Arbitration Act allows parties to select different procedural rules to govern arbitration. *See Volt,* 489 U.S. at 479. And, as discussed more fully below, the parties to the partnership agreement effectively agreed that Idaho law would govern arbitration procedures on this particular point. *See discussion infra* ¶ 1.C.

is governed by Idaho's Uniform Arbitration Act. *See Opp.*, Dkt. 9, at 14 n.3. As a result, it seems unlikely that Beau would lobby for a jury trial, unless, of course, he contends that Idaho's Uniform Arbitration Act contemplates a jury trial on this issue.[5] Because neither side discussed this particular issue, the Court will entertain further briefing before deciding whether to set this issue for a bench trial or a jury trial. Briefing deadlines are set out below.

Aside from the issue of whether there should be a bench trial or jury trial, defendants say there are three reasons why Beau should be forced into arbitration now, without any trial. First, defendants contend Beau is bound by the arbitration clause in the partnership agreement under an equitable-estoppel theory. *See Mot. Mem.*, Dkt. 6-1, at 8. Second, defendants contend that the arbitration clause is enforceable under the severability doctrine. Third, defendants contend that an arbitrator – not a court – must decide whether an arbitration agreement exists because the AAA rules empower arbitrators to decide whether an arbitration agreement exists. The Court will address these arguments – none of which is persuasive – in turn.

### A.    Equitable Estoppel

As for the equitable-estoppel argument, defendants accuse Beau of inconsistency. How, they ask, can Beau allege he is a bona fide limited partner yet at the same time resist the arbitration clause contained in the partnership agreement? *See generally Mundi*

---

[5] The parties should be aware that regardless of whether there is a bench or jury trial on this issue, the Court will try the issue separately from other issues in this lawsuit. *See* Fed. R. Civ. P. 42.

*v. Union Sec. Life Ins., Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) ("Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes.") (internal quotation marks and citation omitted).

Unlike the defendants, however, Beau is not fundamentally at odds with himself. Beau's position is that the partnership agreement exists and that he is indeed a partner – subject to all the benefits and burdens of the agreement. But he does not want to be forced into the arbitration called for under that agreement unless and until a court decides that there was, in fact, an existing agreement. It makes sense for Beau to ask for a judicial determination as to the status of the arbitration agreement in this case, given defendants' denial that Beau ever came into the partnership.

Further, these facts do not fit the typical pattern where a nonsignatory is bound to a contract through an estoppel theory. Typically, a nonsignatory to a contract will knowingly exploit that contract during its lifetime, but then, in the litigation, seek to repudiate the contract's arbitration clause based on the fact that the party never signed the agreement. *See Mundi*, 555 F.3d 1042 at 1045. And the signatory to the contract, who is moving to compel arbitration, will typically affirm the existence of the contract – not deny it. *Cf. Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 100 (3d Cir. 2000) (facing "the anomalous situation where . . . the defendant who denies the existence of the contract, seeks to compel it").

Here, defendants have not pointed to any facts indicating that Beau

"knowingly exploited" the partnership agreement during its lifetime. They just generally assert that Beau is pursuing claims under the partnership agreement. But even more significantly, they fail to acknowledge their own inconsistencies. They dispute whether Beau ever came into the partnership, yet at the same time they wish to hold Beau to the arbitration clause within the partnership agreement. Given their own efforts to demonstrate that no agreement exists between themselves and Beau, defendants cannot rely on an equitable theory to bind plaintiff to the partnership agreement.

B.  The Severability Doctrine

Defendants' invocation of the severability clause is likewise unavailing. The basic principle here is that if a contract turns out to be invalid for some reason, an arbitration clause within that illegal agreement still survives. *See, e.g., Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2005). Significantly, however, the severability doctrine presumes the existence of an underlying contract. So "[e]ven under the severability doctrine, there may be no arbitration if the agreement to arbitrate is nonexistent." *Sandvik,* 220 F.3d at 101.

In *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2005), which is the only case defendants rely upon to advance their severability argument, the Supreme Court specifically noted the distinction between whether a contract is valid and whether the parties ever formed a contact. *Id.* at 444 n.1. *Buckeye* held that an arbitrator could decide whether an existing contract was illegal (due to allegedly usurious interest rates) because the arbitration clause in that contract remained valid under the severability

**MEMORANDUM DECISION AND ORDER - 14**

doctrine.  But the Court clarified that it was not overruling cases "which hold that it is for courts to decide whether the alleged obligor ever signed the contract." *Id.* at 444 n.1.  Not surprisingly then, even after *Buckeye,* the Ninth Circuit has held that challenges to whether a contract was concluded must be decided by the court before arbitration. *Sanford v. Memberworks, Inc.*, 483 F.3d 956, 962-64 (9th Cir. 2007).  As a result, defendants cannot pluck an arbitration clause out of an allegedly non-existent agreement, and then rely on that clause to force a reluctant plaintiff into arbitration.

      The Third Circuit rejected an argument similar to defendants' in *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99 (3d Cir. 2000).  There, defendant Advent moved to compel arbitration based on a contractual arbitration clause.  At the same time, however, Advent argued that the contract containing the arbitration clause never came into existence because the individual who signed the contract lacked authority to bind Advent. In a well-reasoned opinion, the Third Circuit refused to compel arbitration, explaining that a valid agreement to arbitrate could not possibly arise out of a broader contract if no broader contract existed in the first place. As the Court put it:

> Because the legal status of the arbitration clause is unresolved, Advent's desire to arbitrate, separate from the contract, appears as a desire, floating in the legal ether untethered by either reciprocal promises or other sufficient consideration. Only a ruling on the effect of Huep's signature [in other words, a ruling as to whether a broader contract ever existed] can ground Advent's wishes in the firmament.

*Id.* at 109.

The same is true here.  Defendants' wish to arbitrate this matter requires a ruling as to whether the parties agreed Beau would be bound by the 1999 partnership agreement.

### C.   The AAA Rules

Lastly, defendants insist that the parties agreed to have an arbitrator decide whether there is an existing arbitration agreement.  Here, the defendants rely on the arbitration clause in the limited partnership agreement, which provides that the parties will submit controversies to arbitration "according to the rules and practices of the American Arbitration Association . . . ." *Partnership Agmt*. § 15.1, at p. 18.  As already noted, however, the partnership agreement further states that if the AAA rules conflict with Idaho law, then Idaho law will govern.  *Id*.

The AAA rules empower the arbitrator "to determine the existence or validity of a contract of which an arbitration clause forms a part."  AAA Rule 7 (emphasis added).  But that rule conflicts with Idaho law.  It is well settled in Idaho that a court decides arbitrability – not an arbitrator.  *See Mason*, 177 P.3d at 948; Idaho Code § 7-902; *accord Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013); 9 U.S.C. § 4.  Given the conflict between the AAA rule and Idaho law, it can hardly be said that the parties "clearly and unmistakably" agreed to have an arbitrator decide whether the parties had agreed to arbitration.  And the Supreme Court has clarified that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."  *See AT&T*, 475 U.S. at 649.  So

even assuming Beau entered into the partnership agreement, the parties did not clearly and unmistakably agree that an arbitrator could decide whether an arbitration agreement exists.

## 2. Objections to Stewart Affidavit

In addition to their substantive arguments, defendants object to Monte Stewart's affidavit. Mr. Stewart represents Beau in this lawsuit. In his affidavit, he testifies about emails he received from opposing counsel.[6] *See Stewart Aff.,* Dkt. 9-1, Exs. 2-3. In these emails, defense counsel took the position that Beau probably does not have an "enforceable" or "vested" interest in the Lucich family partnership. *Id.* Beau relied on these emails in opposing the motion to compel arbitration.

Defendants' key objection is that the emails contain inadmissible hearsay. But Beau is not seeking to have these emails admitted for the truth of the matter asserted, *i.e.,* that he has no enforceable or vested interest in the partnership. He submitted them to demonstrate that defendants are contesting his status as a limited partner. The hearsay objection is therefore overruled. *See* Fed. R. Evid. 801(a)(2).

More globally, defendants say Mr. Stewart's entire affidavit is objectionable under Idaho Rule of Professional Conduct 3.7. This rule deals with a lawyer's courtroom activity "*at a trial*." Idaho R. Prof'l Conduct 3.7(a) (emphasis added). It prevents a lawyer from acting as an "advocate at a trial in which the lawyer is likely to be a

---

[6] Mr. Stewart testified about other things as well, but the Court did not rely on anything but the emails from counsel in resolving this motion. As a result, the Court does not need to resolve objections unrelated to these two emails.

necessary witness unless, among other things, the testimony relates to an uncontested issue." *Id.*

There are at least three problems with defendants' invocation of this rule.

First, the rule does not speak to the admissibility of any particular statement Mr. Stewart made. It deals with whether he can ethically represent his client. If defendants seriously wish to raise this issue, the procedural choice would be a motion to disqualify. The Court does not mean to suggest that such a motion would be successful. To the contrary, the Court is skeptical that there are grounds for disqualification. But raising this rule of conduct within a series of evidentiary objections – and without any meaningful briefing – does not permit a serious vetting of any issues related to the witness-advocate rule.

Second, raising the rule at this point is premature. This rule does not prevent a lawyer/witness from representing a client during pretrial proceedings.

Third, even assuming the objection was timely, it seems doubtful that the rule would prevent Mr. Stewart from representing Beau at trial. Most significantly, it seems unlikely that Mr. Stewart would need to testify at trial. The testimony at issue – whether the defendants believe Beau obtained an enforceable interest in the partnership – would presumably be elicited from the parties themselves.

**ORDER**

IT IS ORDERED that:

**(1)** Defendants' motion to dismiss this case for lack of subject-matter jurisdiction (Dkt. 6) is **DENIED**.

**(2)** Defendants' motion to compel arbitration (Dkt. 6) is **DENIED** at this time.

**(3)** The parties shall submit simultaneous briefs, not to exceed five pages, as to whether the trial discussed in this order should be a bench trial or a jury trial. These briefs shall be filed within 14 days after this order is signed.

**(4)** Discovery on the limited issue of whether an arbitration agreement exists shall be completed within 60 days of date this order is signed.

**(5)** An order setting a trial date and pre-trial deadlines will be forthcoming.

DATED: October 31, 2013

_____
B. Lynn Winmill
Chief Judge
United States District Court