UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BEAU BURCH-LUCICH,<br><br>    Plaintiff,<br><br>    v.<br><br>GARY L. LUCICH; MARCAE LUCICH; MICHELLE LUCICH NIECE; LUCICH FAMILY LIMITED PARTNERSHIP, an Idaho limited partnership; and NORTHWEST FUNDING, LLC, formerly known as LUCICH LLC, an Idaho limited liability company,<br><br>    Defendant. | Case No. 1:13-cv-218-BLW<br><br>MEMORANDUM DECISION AND ORDER |

# INTRODUCTION

The Court has before it a motion for partial summary judgment filed by defendants. The motion was argued on January 22, 2015, and taken under advisement. For the reasons expressed below, the Court will deny the motion.

# BACKGROUND

Plaintiff Beau Burch-Lucich alleges that his grandparents and aunt collected an inheritance from his father's estate meant for him. He brings this action to recover damages for their fraud.

**Memorandum Decision & Order – page 1**

While this litigation raises many issues, two stand out from among the rest: (1) Is Beau the son of Troy Lucich?; and (2) If Beau is Troy's son, did Troy's parents and sister know about Beau when they probated Troy's estate without mentioning Beau?

Beau was born on February 16, 1990 to Marty Burch (now known as Marty Herrin). Marty claims that Troy is Beau's father. Marty asserts that (1) she and Troy had sexual intercourse on a regular basis between April and July of 1989; (2) that in May or June of 1989, she was pregnant, and shared the results of a pregnancy test with Troy; and (3) that during this period she did not have sexual relations with any other man. *See Herrin Affidavit (Dkt. No. 53-3)* at ¶¶ 2, 4; *Herrin Deposition (Dkt. No. 53-2)* at pp. 348-50.[1]

Marty and Troy were never married. They split up before Beau was born, and never got back together. Troy lived in Idaho while Marty moved to Washington and then to Texas where she raised Beau. In Idaho, Troy married Leslie McKnight (now Leslie Cazamira) in 1993 and they later divorced in 1997. In 1998, Troy died at the age of 31; Beau was 8, but neither he nor his mother Marty was aware of Troy's death until 2004.

Troy died without a will, without a surviving spouse, and without any surviving children other than Beau, whose paternity is at issue here. Under Idaho law, an intestate estate passes to "the issue of the decedent" if there is no surviving spouse. *See* Idaho

---

[1] Defendants argue that Marty claims that she was pregnant in March of 1989, but she later corrected that statement in her deposition. *See Herrin Deposition (Dkt. No. 53-2)* at pp. 348-50.

Code § 15-2-103(a). If there are no surviving issue, the estate passes to "his parents." *Id.* at (b).

On August 21, 1998, defendant Gary Lucich (Troy's father) filed an Application for Informal Appointment of Personal Representative in Intestacy with the Ada County District Court. *See Application (Dkt. No. 53-4).* In the Application, Gary lists the "names and addresses of the spouse, children and heirs of the decedent, and the ages of those who are minors so far as known or ascertainable with reasonable diligence by the applicant." *Id.* He listed (1) himself, (2) his wife, defendant Marcae Lucich, and (3) their daughter, defendant Michelle Bennett. *Id.* He did not list Beau. *Id.* On August 26, 1998, Gary was appointed personal representative of Troy's estate. The estate's assets were eventually distributed to (1) Gary and Marcae; (2) Michelle and her children; and (3) the defendant Lucich Family Limited Partnership. *See Complaint (Dkt. No. 1)* at ¶ 18.

Gary claims that he "had no awareness of Troy Lucich having fathered a child while alive or of the existence and identity of [Beau] prior to 2004." *See Gary Lucich Affidavit (Dkt. No. 48-3)* at ¶ 4. He also alleges that the liabilities of the estate exceeded its assets. *See Statement (Dkt. No. 52)* at ¶ 14.

During the summer of 2004, when Beau was fourteen years old, he wanted to meet his father. Marty learned that Troy had passed away, and she contacted Troy's parents, Gary and Marcae Lucich. She states that they "invited Beau, me, and my two other children to visit and stay with them . . . ." *See Herrin Affidavit, supra,* at ¶ 9. The Luciches arranged and paid for the airfare for their visit. *Id.* They were met at the airport by the Luciches holding a sign stating "Welcome Beau Burch Lucich." *See Photo (Dkt.*

**Memorandum Decision & Order – page 3**

*No. 53-4)*. Marty recalls that "the Luciches said to me that, although they were sure Beau was Troy's son, they thought doing a paternity test would be good for everyone involved." *Id.* at ¶ 10.[2] Marty alleges that the paternity test was done and the results shared. *Id.* Marty lost her copy of the test, and no copy has been provided to the Court.[3]

Shortly after the results of the paternity test were shared, Marty alleges that the Luciches arranged for an attorney to change Beau's name to "Beau Burch-Lucich," and that was accomplished. *Id.* at ¶ 12. In addition, Beau's grandparents told him he was entitled to an 11% interest in the Lucich Family Limited Partnership, which was created in 1999, after Troy's death. That 11% interest was allegedly conveyed to Beau during a family meeting. *See Complaint, supra,* at ¶ 3.

Beau claims he did not learn about the probate of his father's estate until April of 2013. To recover his share of Troy's estate, Beau sued (1) his grandparents, Gary and Marcae Lucich; (2) his aunt – Troy's sister – Michelle; and (3) the Lucich Family Limited Partnership. Beau alleges seven claims against these defendants: (1) probate fraud under Idaho Code § 15-1-106; (2) conspiracy to commit probate fraud; (3) breach of fiduciary duty; (4) conspiracy to breach "partnership fiduciary duties"; (5) constructive trust; (6) declaratory judgment; and (7) a "partner's direct action" under Idaho Code 53-2-1001.

---

[2] These statements of the defendants are not hearsay under Rule 801(d)(2)(A).

[3] While Marty alleges that the test showed that Troy was Beau's father, no test results have been provided to the Court. Marty's statement as to the results of the test are inadmissible hearsay. The Court will therefore ignore her testimony about the results. But her testimony that a paternity test was done is not hearsay because she is recounting a fact she observed.

**Memorandum Decision & Order – page 4**

The defendants have filed a motion for partial summary judgment seeking dismissal of the first and second claims (for probate fraud and conspiracy) and parts of the third and fifth claim (for breach of fiduciary duty and constructive trust) as they relate to the estate of Troy. The defendants' motion challenges Beau's allegations concerning whether he has proffered sufficient proof that (1) Troy is his father; (2) the defendants knew about him when they probated Troy's estate; (3) he was injured by his exclusion from the estate probate proceedings; and (4) he complied with the statute of limitations. The Court will consider each of these issues below, after discussing briefly the legal standard governing summary judgment motions.

## SUMMARY JUDGMENT LEGAL STANDARDS

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

## ANALYSIS

**Paternity**

Defendants argue that there is no evidence from which a reasonable juror could find by clear and convincing evidence that Beau is Troy's son. The Court disagrees. Marty has testified that between April and July of 1989 she "had sexual intercourse with [Troy] regularly and often." *See Herrin Affidavit (Dkt. No. 53-3)* at ¶ 2. She also states

**Memorandum Decision & Order – page 5**

that during that time "I had no sexual relations with any other man." *Id.* She discovered she was pregnant with Beau in May or June of 1989, and gave birth to him on February 16, 1990. *Id.* at ¶ 4; *Herrin Deposition, supra* at pp. 348-50. A reasonable juror could find Marty credible, and find that her testimony provides clear and convincing evidence that Troy is Beau's father.[4] Because questions of fact exist on this issue, the Court rejects defendants' request to resolve this issue as a matter of law.

**Fraud Claim Against Gary and Marcae**

Defendants argue that there is no evidence from which a reasonable juror could conclude that Gary and Marcae knew about Beau when they probated Troy's estate in 1998. The Court disagrees.

First, the probate fraud claim does not require that Gary knew about Beau when he filled out the Application discussed above. The Application required that Gary list Troy's children "so far as known or ascertainable with reasonable diligence by the applicant." That language requires that if Gary suspected that Troy had a child, he must investigate that suspicion with "reasonable diligence." There is no evidence in this record that Gary undertook any such investigation. So the probate fraud claim turns on whether Gary suspected that Troy had a child, not on whether Gary knew about Beau.

What evidence exists that Gary suspected Troy had a child? There is evidence from which a reasonable jury could infer that (1) Troy suspected he fathered Beau, and

---

[4] During oral argument, Beau's counsel conceded that the clear and convincing standard applied here.

(2) that Troy told Gary prior to 1998 that Marty was demanding child support for Beau. The Court turns first to evidence that Troy suspected he fathered Beau.

This paternity evidence centers on Marty's allegations, identified above, that she and Troy had regular sex from April to July of 1989, and she became pregnant around May of 1989 and communicated the results of a pregnancy test to Troy. *See Herrin Deposition (Dkt. No. 53-2)* at pp. 348-50. Troy's reaction is captured in his writings on a tablet on which he and Marty exchanged messages to each other:

**Troy**: "I was going to send you home . . . [b]ut I can't let you go home with our child!!"

**Marty**: "Are you disappointed?"

**Troy**: "No, I already knew I was a dad."

**Marty**: "Just wondering! You never can tell something could happen."

**Troy**: "Something? What 'honestly' are you talking about?"

**Marty**: "Miscarriage or something with my blood!"

**Troy**: "I'm a little worried about a miscarriage but not you blood."

*See Tablet (Dkt. No. 53-3)* at App. 167-71.[5]

A reasonable juror could find from this evidence that – at the very least – Troy suspected he was the father of Marty's baby. Did Troy communicate this to Gary before

---

[5] Troy's statements are contrary to his pecuniary interest because they expose him to liability for child support. Thus, although his statements are hearsay, they fall within the exception listed in Rule 804(b)(3)(A).

the probate of the estate in 1998? A reasonable juror could so infer, based on testimony concerning two phone calls, and their aftermath, in 1993.

Marty testified that she called Troy in 1993. *See Herrin Deposition, supra,* at p. 133. Troy's wife at the time – Leslie – testified that Troy took the call and that she stood nearby listening to his end of the conversation. *See Cazamira Deposition (Dkt. No. 53-2)* at p. 32-33. Leslie recalls that after some conversation over the phone, Troy "put the phone on hold" and "told me that there was this woman on the phone and she was saying that he had – that he had to pay child support." *Id.* at p. 33. Leslie asked Troy whether he had a child, and he responded that he did not know. *Id.* at pp. 32-33. Leslie took the receiver from Troy and told Marty that a DNA test was necessary for child support, at which time the call ended.[6] *Id.* In her deposition testimony, Marty confirmed that they demanded a paternity test. *Herrin Deposition, supra* at p. 134.

Leslie testified that a few months later, a woman (presumably Marty) called again, repeating her demand for child support. Leslie recalls that Troy told her that the child at issue was named Beau. *Cazamira Deposition* at p. 104. During this second call, Leslie and Troy demanded DNA testing before any child support would be paid, and the call ended with nothing being resolved. *Id.* at pp. 36-37. After Troy hung up the phone, and as Troy and Leslie were discussing the call, Michelle arrived – Leslie recalls that "we

---

[6] Marty's demands for child support, and the counter-demands by Troy and Leslie for a DNA test, are not hearsay because they are offered simply to prove demands were made, not to prove the truth of any fact asserted in the demands. *See U.S. v. White,* 639 F.3d 331, 337-38 (7th Cir. 2011) (holding that note demanding money was not hearsay because it was offered to prove a demand, not to prove the truth of any fact asserted in the note).

**Memorandum Decision & Order – page 8**

talked with her [Michelle] about it [the call]" and that "[w]e told Michelle there was this woman saying there was a child that was Troy's child." *Id.* at pp. 38-39. According to Leslie, Michelle responded that Gary and Marcae needed to be told about this.[7] *Id.* at p. 40. Troy said that he would tell his parents. *Id.*[8] A reasonable juror could infer that Troy, facing an expensive dispute over child support, would seek help from his parents because, as Gary testified, "I financed or I gave both of my children financial assistance whenever I felt they needed it or they needed to purchase something." *See Gary Lucich Deposition (Dkt. No. 48-10)* at p 38 (discussing providing financial assistance to Troy in 1997 by purchasing his home).

Shortly after that second call – or as Leslie testified, "on the heels of that second phone call" – Gary told Leslie during a dinner conversation that "it looks like we have an issue that needs to be dealt with." *Cazamira Deposition, supra,* at p. 44. When Leslie responded that she did not know what he was talking about, Gary replied, "I think you do," at which point Leslie walked away.[9] *Id.*

From the entirety of evidence discussed above, a reasonable juror could infer that (1) Troy strongly suspected he was Beau's father and was concerned about Marty's

---

[7] Michelle's comments, related by Leslie, are not hearsay under Rule 801(d)(2)(A) because they are the statements of a defendant offered against her.

[8] Assuming Troy's statement is hearsay, it falls within the exception in Rule 803(3) as a "statement of the declarant's then-existing state of mind (such as . . . intent or plan)."

[9] Gary's comments, related by Leslie, are not hearsay under Rule 801(d)(2)(A) because they are the statements of a defendant offered against him.

demand for child support; (2) Troy sought financial help from his parents by telling them about Marty's child support demands and his suspicions that he was the father; (3) that Marty's child support demand was the subject of Gary's comments to Leslie during their dinner conversation; and (4) therefore Gary suspected prior to the 1998 probate that Troy had a son.[10]

Defendants deny any knowledge of Beau until meeting him in 2004. Under the defendants' version, a previously unknown woman (Marty) called them out of the blue in 2004 – eight years after Troy's death – to inform them that Troy had a previously unknown son (Beau). Such a call would typically elicit skepticism at best and hostility at worst. But the Luciches responded in a way that could lead a reasonable juror to infer they had suspected for some time that Troy fathered a son. The Luciches invited Marty and her family to stay with them and paid their airfare to fly to Boise. When they arrived at the Boise airport, they were warmly received by the Luciches – a welcome that included a sign held by Michelle stating "Welcome Beau Burch Lucich." These are the actions of a family that had suspected for some time that Beau was Troy's son.[11]

---

[10] The Court has not considered Troy's July 1989 letter to Marty regarding showing the ultrasound photo to his parents. The Court finds that it need not resolve the evidentiary challenges to the letter at this time because enough other evidence creates questions of fact warranting a denial of the motion for summary judgment.

[11] Defendants argue that even if the 2004 welcome infers some prior suspicion on the part of the Luciches, to rely on the 2004 welcome to infer suspicion all the way back to the 1998 probate would be to stretch the inference far beyond its breaking point. The Court agrees. But the 2004 welcome does not stand alone – it must be examined in the context of the entirety of the evidence discussed above. Moreover, its real significance comes from the way it contradicts the defendants' version of events, as discussed above.

**Memorandum Decision & Order – page 10**

All of this evidence taken together creates questions of fact over whether the defendants suspected – prior to the 1998 probate – that Troy fathered a child. The Court therefore rejects defendants' request to decide this issue as a matter of law.

**Injury**

Defendants argue that because the estate's liabilities exceeded its assets, Beau suffered no injury from being precluded from the probate proceedings. But there are questions of fact on this issue. Beau points out that Idaho law would have allowed him to claim exempt personal property up to a value of $3,500 and a homestead allowance up to $10,000, to be paid ahead of any claims against the estate. Defendants do not contest that reading of Idaho law. It at least creates a question of fact precluding summary judgment for the defense on this issue.[12]

**Statute of Limitations**

This action was filed on May 30, 2013. The parties agree that the fraud and conspiracy claims are barred if Beau had "discovery of the fraud" at any time more than two years before that date, e.g., before May 30, 2011. *See* Idaho Code § 15-1-106 (requiring that "[a]ny proceeding must be commenced within two (2) years after the discovery of the fraud").

Under the general law regarding the discovery rule, the limitations period does not begin until the plaintiff has actual knowledge of the facts constituting fraud, which may

---

[12] Both sides reserve an argument on whether the $75,000 minimum damage amount for diversity jurisdiction is present here. The Court will not take up the issue until it is fully briefed.

be inferred in some circumstances if the aggrieved party could have discovered the fraud by reasonable diligence. *McCoy v. Lyons*, 820 P.2d 360, 368 (Idaho 1991). But the discovery rule "requires more than an awareness that something may be wrong . . . ." *Id.* at 368. Moreover, under the statute governing probate fraud, "there is no duty to exercise reasonable care to discover fraud; the burden should not be on the heirs and devisees to check on the honesty of the other interested persons or the fiduciary." *See* Comment to Official Text, Idaho Code §15-1-106.

      Here, Beau testified that he trusted his grandparents. Certainly the warm welcome he received in 2004 from his grandparents, and their hospitality in letting them stay for four months, would have instilled trust. It was not until they got into an argument that Beau checked the probate records in April of 2013, saw that Troy died without a will, and discovered the alleged probate fraud. *See Burch-Lucich Affidavit (Dkt. No. 53-3)* at ¶ 18. While there is other evidence that he may have been questioning his grandparents' good faith prior to 2013, the Court must assume Beau's allegations are true, and so cannot resolve this issue as a matter of law. *McCorkle v. Northwestern Mutual Life Ins. Co.,* 112 P.3d 838, 843 (Idaho Ct. App. 2005) (holding that "the question of when the plaintiff discovered the fraud is generally a question for the jury, and summary judgment on the issue is only appropriate if there is no factual dispute about when this discovery occurred").

## Conclusion

      The briefing raises other issues, but the findings above warrant denial of the motion for partial summary judgment in its entirety.

**Memorandum Decision & Order – page 12**

# ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for partial summary judgment (docket no. 48) is DENIED.

DATED: March 31, 2015

_____
B. Lynn Winmill
Chief Judge
United States District Court